IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-01165-KLM

JANE DOE,

I.B. by her mother and next friend, Jane Doe,

      Plaintiffs,

v.

APRIL WOODARD, El Paso County Department of Human Services caseworker, individually,

CHRISTINA NEWBILL, Supervisor, El Paso County Department of Human Services, individually,

SHIRLEY RHODUS, Children, Youth and Family Services Director, El Paso County Department of Human Services, individually,

RICHARD BENGTSSON, individually, and in his official capacity as Executive Director, El Paso County Department of Human Services for prospective relief,

REGGIE BICHA, Executive Director of the Colorado Department of Human Services, in his official capacity for prospective relief,

EL PASO COUNTY BOARD OF COUNTY COMMISSIONERS, comprised of Sallie Clark, Darryl Glenn, Dennis Hisey, Amy Lathen, and Peggy Littleton, in their official capacity.

      Defendants,

---

**FIRST AMENDED COMPLAINT**

---

      Plaintiffs, I.B. and Jane Doe, by and through their undersigned counsel, Telios Law

PLLC, allege against Defendants:

## I.  INTRODUCTION

1.     On at least two occasions, a caseworker from the El Paso County Department of Human Services (DHS) strip searched and/or photographed private areas of I.B.'s person without obtaining consent from her mother, or even notifying her mother, despite the fact that allegations of abuse were known to be likely unfounded because of previous false reports.

2.     The searches were conducted as a result of statewide DHS policy and a local El Paso County unwritten, but well-established, policy and custom that allowed for the widespread strip searching and photographing of children suspected of being abused without regard to Fourth Amendment reasonableness.

3.     As a result of one search in particular, I.B. and Jane Doe bring this action against Defendants for damages for violation of their constitutional rights under the Fourth and Fourteenth Amendments. As a result of Defendants' unlawful actions, Jane Doe and I.B. have suffered psychological distress. Plaintiffs also seek declaratory and injunctive relief against the unconstitutional DHS policies, and to have the photographs of I.B. destroyed.

## II.  SUBJECT MATTER JURISDICTION

4.     This action arises under the United States Constitution, particularly the Fourth and Fourteenth Amendments, and under federal law, particularly 42 U.S.C. §§ 1983 and 1988. This Court has original jurisdiction of this claim under, and by virtue of, 28 U.S.C. § 1331, and 28 U.S.C. § 1343.  This Court is authorized to award attorney's fees under 42 U.S.C. § 1988.

### III.  PERSONAL JURISDICTION

5.     This Court has personal jurisdiction over Defendants pursuant to proper service of summons with a copy of this Complaint and the fact that Defendants are geographically located in the state of Colorado.

### IV.  VENUE

6.     Venue is proper in the United States District Court of Colorado under 28 U.S.C. § 1391(b), because all Defendants are residents of the state of Colorado and a substantial part of the events or omissions giving rise to the claims occurred in the state of Colorado.

### V.  PARTIES

7.     Plaintiff, Jane Doe, is a natural person who was at the time of the searches of I.B., a resident of Colorado Springs, Colorado. She is a disabled veteran of the United States Army, and is now a fulltime mother.

8.     Plaintiff, I.B., Jane Doe's daughter, is a natural person who was at the time of the searches, a resident of Colorado Springs, Colorado, and was four years old at the time of the incident giving rise to the claims.

9.     Defendant, April Woodard, is a natural person, a caseworker for the El Paso County DHS, acting under color of law, including state statutes and local ordinances, regulations, policies, customs, and usages.

10.     Defendant, Christina Newbill, is a natural person, a supervisor and social worker for the El Paso County DHS, acting under color of law, including state statutes and local ordinances, regulations, policies, customs, and usages.

11.     Defendant, Shirley Rhodus, is a natural person, Children, Youth and Family Services Director for the El Paso County DHS, acting under color of law, including state statutes and local ordinances, regulations, policies, customs, and usages.

12.     Defendant, Richard Bengtsson, is a natural person, the Executive Director of the El Paso County DHS, acting under color of law, including state statutes and local ordinances, regulations, policies, customs, and usages. He is also sued in his official capacity as the Executive Director of El Paso County DHS for prospective relief.

13.     Defendant, Reggie Bicha, is a natural person, the Executive Director of the Colorado DHS, and is sued in his official capacity, for prospective relief only.

14.     Defendant, El Paso County Board of County Commissioners (BOCC), comprised of Sallie Clark, Darryl Glenn, Dennis Hisey, Amy Lathen, and Peggy Littleton, is the governing body of El Paso County. El Paso County DHS reports to El Paso County, and is partially financed by it.

## VI. GENERAL ALLEGATIONS

*The background for the incident*

15.     From 2012 through 2014, DHS investigated I.B.'s home around half a dozen times, based on false reports that I.B. was being abused.

16.     I.B. lives in a home with her mother, Jane Doe, her younger brother, and her live-in stepfather, mother's boyfriend, who is a military veteran.

17.     Each time they visited the house, DHS caseworkers examined the pantry, fridge, kids' room, Jane Doe's room, and spare room, despite the fact that all false allegations were of physical abuse.

18.     Each time, the report of abuse was false.

19.     Each time, either the case was closed as unfounded, or no documentation was kept at all, as only three incidents are recorded in the case files.

20.     Even though Jane Doe asked for documentation, DHS personnel never provided her with documentation of the false reports and DHS investigations.

21.     Jane Doe finally got information about her own files through a Colorado Open Records Act (CORA) request filed by her counsel, but the files do not contain all the visits that actually happened.

***First Search of I.B.***

22.     I.B. attended the Head Start program at Oak Creek Elementary School in Colorado Springs.

23.     I.B.'s teacher told I.B.'s stepfather that he looked like a violent person, because, in common with many military personnel, he wore leather gear, rode a motorcycle, and had tattoos.

24.     According to DHS records, on November 22, 2013, a report came in that I.B. "had marks that resembled a hand print on her bottom." The reporter also stated that there was a "bruise the size of a dollar bill" on I.B.'s lower back.

25.     At the time of the report to DHS, a teacher had observed I.B.'s bottom, as had the behavioral health consultant at the school.

26.     I.B. was three at this time.

27.     Amanda Albert, a DHS caseworker, also "observed" I.B.'s bottom, but did not find marks that resembled a hand print on her bottom. Instead, she found a rash on I.B.'s bottom that "did not appear as though this mark came from a hand, belt, or other object."

28.     Ms. Albert found a very small abrasion in I.B.'s back with a linear welt that looked like a reaction to a band aid.

29.     The caseworker also checked I.B.'s younger brother, E.B., for marks or bruises.

30.     Jane Doe was not asked for permission for the strip search of either child, nor was she notified that three adults had viewed I.B.'s private areas.

31.     In fact, she was never informed about the strip search, even afterwards, and only recently discovered it through a CORA request.

32.     The investigation was closed as unfounded on January 30, 2014.

33.     Thus, that report was a deliberate false report.

*34.*     Shortly after this search, another report was called in January 22, 2014, apparently also from the school, related to a bruise on I.B.'s forehead, which was also determined to be unfounded. No further information was provided in the records.

### *The Second Search of I.B.*

35.     Several months later, DHS again received a report that I.B. was being abused. According to DHS records, this was December 9, 2014. At this time, I.B. was four.

36.     Allegations of abuse included little bumps on I.B.'s face, a bruise about the size of a nickel on her neck, a small red mark on her lower back, two small cuts on her stomach, and bruised knees.

37.     According to DHS records, on December 10, Ms. April Woodard, a DHS caseworker, received permission from her supervisor, Ms. Christina Newbill, to view I.B.'s "buttocks, stomach/abdomen, and back so Caseworker could look for marks/bruises."

38.     The Oak Creek Elementary health paraprofessional, Doris Swanstrom, met with Ms. Woodard in the nurse's room. Ms. Woodard instructed I.B. to show her buttocks and stomach and back.

39.     I.B. states that an adult took off all I.B.'s clothes. The adults viewed I.B. and prepared to take photographs.

40.     I.B. told Ms. Woodard she did not want photographs taken. Nevertheless, the caseworker took color photographs of private and unclothed areas of I.B.'s body.

41.     I.B. is still upset that photographs of her unclothed body were taken without her consent.

42.     Ms. Woodard called on Jane Doe, following up on the report of child abuse. Ms. Woodard also inspected the home.

43.     According to DHS records, this happened on December 11, 2014. However, Jane Doe recalls this visit as happening at the time she had just purchased her groceries for Thanksgiving dinner, so DHS records may be in error as to the date.

44.     At that time, Ms. Woodard informed Jane Doe, in front of I.B., that she should not ever spank I.B., despite the fact that parental spanking is legal in Colorado.

45.     To this day, I.B. tells her mother, "Mommy, you know you can't spank me because you will get in trouble, and I know that!"

46.     Jane Doe was upset that someone kept filing false reports. She asked the DHS caseworker if she could pull her child out of school. The DHS caseworker said that she could, but it would "look suspicious."

47.     Ms. Woodard eventually concluded that the marks observed were not consistent with the reporter's statement, and that I.B. gets pretend play mixed up with reality. The case was closed as unfounded on January 5, 2015.

48.     Jane Doe thought the incident had been resolved after Ms. Woodard's visit. But about a week after Ms. Woodard visited her home, while driving to school, I.B. said something alarming about her encounter with the caseworker: "Mommy, do you remember when the woman with white hair came to my school? I hope she doesn't come again, because I don't like it when she takes all my clothes off."

49.     Jane Doe immediately contacted the school about the incident. No one at the school would admit to a strip search. Jane Doe remained persistent in her search for answers, even going as far as to contact the superintendent. Eventually, she was informed by school officials that it was in fact a DHS caseworker who performed the strip search.

50.     Jane Doe attempted to contact Lisa Little, a DHS supervisor whose name is on the files. Ms. Little never returned the call.

51.     Eventually, Jane Doe spoke to Ms. Woodard, who denied having performed a strip search of I.B.

52.     A few weeks later, the situation became even more concerning to Jane Doe when I.B. informed her mother that they had also taken pictures of I.B. with her clothes off, even though she told them not to.

53.     Jane Doe tried for weeks to get a response from DHS, and was ignored.

54.     Around January 28, 2015, Ms. Woodard finally contacted Jane Doe and told her the case was closed. At that time, Jane Doe asked again if Ms. Woodard had searched I.B. under her clothes. Finally, Ms. Woodard admitted that she did undress and photograph I.B. without asking for permission. She insisted that she was well within her right to do so.

55.     Ms. Woodard stated to Jane Doe that she and the school nurse observed I.B.'s "buttocks, back, and stomach" due to concerns of physical abuse.

56.     Jane Doe asked Ms. Woodard why she had lied before. Ms. Woodard said it was because she had legitimate concerns for I.B.'s safety, and Jane Doe did not need to know at the time about the strip search.

57.     Jane Doe asked about her right as a mother to know or consent to a strip search of her child's private areas.

58.     Ms. Woodard informed Jane Doe that if there is suspicion of abuse, those rights are voided.

59.     No allegations of abuse of I.B. were made against Jane Doe directly in connection with this incident.

60.     Jane Doe responded by telling Ms. Woodard that she had called a lawyer.

61.     The very next day, a different DHS caseworker came to Jane Doe's home, claiming that a report of abuse had been alleged against I.B.'s younger brother.

62.     No records of this visit were produced in response to a CORA request.

63.     At that time, Jane Doe asked the caseworker what she could do to stop the persistent false reporting and the intrusive investigations. The DHS caseworker simply responded, "The more it happens, the more it will keep happening." She also informed Jane Doe that pulling the children out of school would make Jane Doe "look even more guilty."

64.     Just like the numerous other reports lodged against Jane Doe's children, this report was also unfounded.

65.     After this incident, I.B. no longer wished to attend school, and said that she did not feel safe.

### *Effect on Family*

66.     As a result of the compelled search and photographing, I.B. did not feel safe at school. I.B. suffered trauma similar to that suffered by children who are sexually abused, and the trauma is likely to continue. I.B. is still angry and upset at the incident in November or December 2014 and talks about it frequently. She has also experienced an erosion of her natural protective boundaries, including an inappropriate willingness to take off her clothes for strangers.

67.     After hiring counsel, I.B. left school, and no longer receives the benefit of Head Start.

68.     Jane Doe has suffered distress at the violation of her parental rights. She fears for the safety of her children. She is distressed at the intrusion suffered by them, and at their potential exposure to sexual abuse.

69.     Based upon information and belief derived from sworn testimony from Ms. Lisa Little, color photographs of I.B.'s private areas taken by DHS caseworkers likely exist and are insufficiently secured by DHS. The fact that nude photographs of I.B. are not sufficiently secured, and that access to them may be given to anyone who works at DHS, is distressing to Jane Doe.

70.     Jane Doe and I.B. remain in fear that DHS will once again subject I.B. to an unconstitutional search and that damages will be exacerbated. This fear is primarily based on Jane Doe being told that the more reports of abuse are lodged against I.B.—false or otherwise—the more DHS will be involved in their lives. While Jane Doe and I.B. currently live in Colorado, they have plans to relocate out-of-state; however, they also have concrete plans to return. These plans include regular visits to grandparents who live here. Moreover, they plan to return to Colorado for the proceedings in connection with this lawsuit, all under the watchful eye of DHS. Jane Doe and I.B. fear that a search of I.B. may be compelled against Jane Doe's consent based on the position DHS has taken thus far.

***Background on Strip Searching and Photographing Children in Child Abuse Context***

71.     Children are taught early that no one should look at or touch (or photograph) their private parts except for health reasons and in a professional medical setting.

72.     They are specifically taught not to allow strangers to see or touch their private parts, especially adult strangers. A strip search, which involves exposing one's private parts to adult strangers, is contrary to this training, and creates safety issues for children.

73.     Strip searches are demeaning, dehumanizing, and degrading.

74. A strip search during a child abuse investigation is very different from examination of the same part of the body during an annual checkup in context, methodology, and safeguards.

75. Children often experience strip searches as sexual abuse.

76. Strip searches also raise the real possibility of actual child abuse. Child abusers seek situations where they have access to children. Some known offenders have acquired access through government employment to examine or photograph children's naked bodies.

77. Photographs of strip searches can be, and sometimes are, used as child pornography. Many pictures of naked children end up on the Internet.

78. Known sexual offenders have used search terms such as "youth strip search" and "nude strip search" to obtain child pornography.

79. The careless handling of photographs under DHS policy creates a real risk that the photographs will enter the stream of child pornography.

### DHS Training and the Lack Thereof

80. It is clearly-established law in the Tenth Circuit that the Fourth Amendment applies to caseworkers. It is also clearly-established law that parents and children have Fourteenth Amendment rights.

81. Upon information and belief, Defendants Woodard and Newbill have received no training from DHS or El Paso County on Fourth Amendment limitations on search and seizure, as applied to social workers. Defendants Rhodus and Bengtsson have not provided such training.

82.     One DHS supervisor testified that she does not even know what the Fourth Amendment says.

83.     DHS training materials contain no guidance about constitutional ways to examine children or photograph their private areas. They contain no guidance about parents' and children's constitutional rights not to consent to invasive searches of children.

84.     DHS training materials and regulations contain no restrictions on searches of private areas of the body related to the age, gender, or sexual orientation of either the child or the caseworker.

85.     Training on how to photograph children consists of instructions to take a color photograph of the body part, as well as a photograph of the child's face, to connect the face and the body part.

86.     DHS training materials and regulations contain no guidance about how to secure photographs of private areas of children or to safeguard such photos from making their way into the stream of online child pornography.

87.     DHS training is in line with its unwritten policies and customs.

***DHS' Unconstitutional Policies and Customs***

88.     Defendants Rhodus, Bengtsson, and Colorado State DHS have instituted and approved unconstitutional policies and customs.

89.     Colorado State DHS has stated in Responses to Joint Budget Committee (JBC) Questions from the legislature, dated 12-3-2013, "There is no limitation on the taking of the photographs because the purpose is to document injuries, regardless of where the injuries may

be." It also stated, "Workers are trained to collect photographic evidence of physical abuse whenever it is encountered whether it is in 'private areas' or areas not covered by clothing." And it stated, "The Department has not developed specific oversight procedures regarding obtaining photographic evidence of abuse."

90. As of November 2014, however, DHS had a written "policy" entitled "Practice Guidance" "The Use of Photography During the Course of a Child Abuse and/or Neglect Assessment" (hereinafter "statewide policy"), which was drafted in "response to a request for clarification regarding CDHS' position on the use of photography and provisions in state rule and statute that govern its use."

91. Pursuant to this policy, DHS takes the position that if a caseworker has a BSW, MSW, or DSW, section 19-3-306 of the Colorado Revised Statutes further clarifies their role, by allowing a social worker "who has in front of them a child believed to be abused or neglected" to "take color photographs." The policy does not provide guidance that the photography, or searches to enable photography, must be done in accordance with Fourth Amendment reasonableness. In fact, the child's or parent's rights are never mentioned.

92. The statewide policy states that parental consent for photographs is not required.

93. The statewide policy notes that if a child welfare worker is faced with a situation where the area of the child that needs to be photographed is normally clothed, the worker should "consult local policy regarding the use of photograph."

94. To date, no local written policies or guidelines about strip searching and photographing the portion of the body normally clothed have been developed in El Paso County;

however, El Paso County DHS has clearly defined unwritten policies and customs. Its agents regularly perform strip searches, (also called "body audits" or "skin checks") and photograph the results of those searches.

95.     All the policies, customs, and practices developed as local policy are either in accordance with, or specifically endorsed by the statewide policy.

96.     In accordance with the statewide policy, under El Paso County DHS local policy and custom, parental consent is not needed. It is routine not to contact or inform parents of the strip search beforehand. Usually, parents will be notified afterwards, but not always.

97.     A DHS supervisor testified that under federal law, caseworkers do not need to try to contact parents before investigating a child under the clothing.

98.     When abuse is alleged, the child is typically interviewed without parents present, but normally the interview is not audiotaped or videotaped. If parents later wish to review the interview protocols or know what was said, the only documentation is the brief notes in the DHS file.

99.     El Paso County DHS unwritten policy and custom is to search any area of a child's body upon which abuse is alleged.  When physical injuries to children's private areas under clothes are alleged, caseworkers routinely view those private areas.

100.     DHS personnel rely on a statute, C.R.S. § 19-3-306, which provides that any social worker who has before him a child he reasonably believes has been abused or neglected may take or cause to be taken color photographs of the areas of trauma visible on the child.

101. Just like the statewide policy guidance, El Paso County DHS local policy and custom interprets that as permission to strip search children to make their private areas visible. However, El Paso County does not limit the statue to licensed social workers, but interprets it to apply to any child welfare worker, regardless of training or qualifications. Defendants Bicha, Bengtsson, and Rhodus have provided no constitutional limitations on how DHS interprets the statute.

102. El Paso County DHS has no requirement that the caseworkers performing searches or photographing children suspected of abuse be licensed social workers; and in fact, many are not.

103. If a child is at school when an allegation of a mark on a private area of a child is made, a DHS caseworker visits and carries out the strip search at school.

104. Caseworkers have discretion to request a medical examination for genital searches, but that is not required, as they are permitted to perform such a search themselves. Whether genital searches take place is wholly within the discretion and comfort level of the individual caseworker.

105. Searches of private areas of a child happen dozens, perhaps hundreds, of times a year in El Paso County alone.

106. Operating under the custom and policy, caseworkers routinely omit notifying parents, obtaining consent, obtaining medical orders, or asking parents if they will comply with an official medical examination.

107. These searches routinely take place in a casual (rather than clinical or professional) setting: a room in the child's home, any room provided at school, or available space

in any other setting where the child may be at the time a caseworker makes contact with her. It is DHS protocol to search the children in these environments.

108.    DHS policies and customs provide no clinical approach, no special clothing, and no depersonalizing of the child's body parts to be examined, as occurs in a medical examination.

109.    DHS policies and customs have no limitations on these searches related to the age or gender of the child.

110.    DHS policies and customs have no formal limitations on these searches related to the gender of the social worker and the child. Usually the social worker will be the same gender as the child, or at least one of two people present will be the same gender, but there is no requirement that this be the case. There is no policy or provision to protect children where either the social worker or the child may be same-sex-oriented or transgender.

111.    DHS has no policies of the type commonly known as "child protection policies," which define appropriate and inappropriate touching of a child, regardless of gender of the adult.

112.    The custom and policy has inadequate safeguards for protecting children from the trauma of such a search, often experienced by children as sexual abuse, or from intentional sexual abuse by perpetrators in such circumstances.

113.    Usually, the child is told to remove his or her own clothes, though in cases of a small child, sometimes the caseworker will remove the clothes.

114.    A DHS caseworker views the area of the child's body and takes color photographs.  A color photograph is taken of the area of the child's body implicated by the

allegations. An accompanying photo is also taken of the child's face, to provide positive identification for the color photograph of the body part.

115.    The photograph is taken of the mark, or of the child's body to show there was "no mark," to have a record that there was no abuse. Pictures of both "marks" and "no-marks," to include private areas under clothes, are taken and stored.

116.    Color photographs of children, including of private areas of the child, are taken on cell phones issued by the County.

117.    The color photographs stay on the cell phones up to many weeks, until the social worker writes the report on that child.

118.    Beyond the basic confidentiality agreement to work at DHS, the policies have no safeguards or protocol in place to prevent color photographs of the private areas of children from being uploaded from cell phones to the Internet, or uploaded or synced to another device, such as a home computer. There is no technology in place to prevent this.

119.    DHS policies have no safeguards or mechanism to make sure that color photographs of the private areas of children are permanently deleted from these cell phones.

120.    At some point, the color photographs of children's faces and their body parts may be downloaded into electronic files.

121.    Commonly, they are printed out, labeled, and kept indefinitely in paper files.

122.    These paper files are stored in one or more filing rooms at DHS. Multiple people have access to these files, and therefore to the color photographs. People who have access include all managers, all caseworkers, all case aides, all county attorneys, and anyone who works at DHS.

123.     Anyone who has access to the filing room can access and view any of the files and color photographs. Any person could check the file of any child.

124.     The photographs are not safeguarded under HIPAA standards, as would take place in a medical examination.

***DHS Personal and Entity Responsibility for Training, Policies, and Procedures***

125.     The responsibilities of Defendants Rhodus and Bengtsson are stated in their official job descriptions, and they are personally responsible for caring out these duties.

126.     Richard Bengtsson, Executive Director of the El Paso County DHS, directs all the programs and services of DHS. He is responsible for developing and implementing departmental goals, objectives, and policies. He oversees all DHS personnel and is supposed to ensure that "qualified, trained people are performing human services functions." He is responsible for developing and implementing constitutional policies, having qualified, trained people in place, and protecting children from unconstitutional and harmful actions. He is also responsible because he has adopted and approved of unconstitutional local policies and customs of: searching the private areas of children's bodies without consent or a court order; taking color photographs of those areas; and failing to safeguard those photographs. He has failed to have trained people in place and failed to protect children. In addition, he may be sued consistent with the Eleventh Amendment, in his official capacity for prospective relief and may be enjoined in his official capacity from carrying out unconstitutional policies to the extent they violate federal law.

127.     Shirley Rhodus, Children, Youth and Family Services (CYFS) Director, is responsible for instruction and training of DHS managers, and updating them in agency

practices, policies and procedures. She develops, implements, and monitors CYFS programs "to ensure compliance with all applicable federal, State and local regulations." Her job is to develop, establish and communicate policies and procedures, as well as to make sure they are implemented. She is responsible for developing, implementing and training in constitutional policies, which she has not carried out. She is also responsible because she adopted and approved of unconstitutional local policies and customs of: searching the private areas of children's bodies without consent or a court order; taking color photographs of those areas; and failing to safeguard those photographs.

128.    Reggie Bicha, Executive Director of the Colorado Department of Human Services, is responsible for DHS policies. He may be sued consistent with the Eleventh Amendment, in his official capacity for prospective relief and may be enjoined in his official capacity from carrying out unconstitutional policies to the extent they violate federal law.

### *El Paso County Responsibility for DHS Policies, and Procedures*

129.     "Local policy" is developed by El Paso County DHS, but oversight is also provided by the El Paso County BOCC, as agents of El Paso County. El Paso County is also responsible for the welfare and safety of children in the County.

130.    The El Paso County Commissioners use county sales tax to fund DHS. The County provides more than a quarter of DHS funding.

131.    In addition, the County has a Department of Human Services Advisory Commission, which has the mandate to review DHS programs and funding and monitor the implementation of DHS initiatives and mandatory services. Because it uses citizen taxes to fund

DHS and has responsibility for oversight, it is responsible for the local policies and customs of El Paso County DHS.

132.    It has the power to approve, condemn, and otherwise direct DHS policies by virtue of its funding and oversight.

133.    It has a duty to the citizens of El Paso County to protect the welfare of children and safeguard them from constitutional violations and from being endangered by intrusive searches and careless handling of photographs of private areas of their bodies.

*134.*    Rather than review and monitor DHS adequately, the BOCC chose instead to approve and support these unconstitutional policies.

### *Awareness of the Issues*

135.    In April of 2013, *Doe v. McAfee et al*, 13-CV-01287-MSK-MJW, was filed against defendants, who included the El Paso BOCC and Richard Bengtsson. Upon information and belief, Shirley Rhodus was also aware of the lawsuit's allegations.

136.    *Doe v. McAfee* alleged that searches under children's clothes, and taking pictures of private areas of children, without consent or a court order, were a violation of constitutional rights, and that these searches were occurring on a routine basis in El Paso County. The case also alleged that such actions endanger children. While the actual strip search claims were dismissed, because the caseworker failed in her spirited effort to search and photograph the child, six claims of retaliation against the family were permitted to go forward against County personnel.

137.     Recently, the DHS Advisory Commission, which is appointed by and acts on behalf of the Board of County Commissioners to oversee DHS, was served a Colorado Open Records Act request. It was asked for the following:

a.    "Any meeting minutes, recordings of meetings, or other records of the El Paso County Department of Human Services Advisory Commission which reflect discussion or policy making regarding an El Paso County Department of Human Services policy related to investigating child abuse allegations where the child's clothing must be removed to investigate the injury."

b.    "Any meeting minutes, recordings of meetings, or other records of the El Paso County Department of Human Services Advisory Commission which reflect discussion or policy making regarding an El Paso County Department of Human Services policy related to investigating child abuse allegations where clothing is removed and color photographs are taken, including any guidance on how to handle photographs that are taken."

138.     According to the County, no records exist that are responsive to that request.

139.     Thus, despite the issues raised in the lawsuit, the issue has not been formally discussed, nor have formal policies been developed, but the local custom and informal policy continues to thrive.

140.     The lawsuit was also drawn to the attention of state DHS by the JBC Committee of the Colorado General Assembly.

141. State DHS responded by developing a statewide policy that has key Fourth Amendment protections missing.

## VII. CLAIMS FOR RELIEF

### First Claim for Relief
**Violation of I.B's rights under the Fourth Amendment of the U.S. Constitution to be free from unreasonable searches and to personal privacy by Defendants Woodard and Newbill.**

142. Plaintiffs incorporate here by reference the allegations set forth above.

143. Defendants at all times acted under the color of state law.

144. The Fourth Amendment to the United States Constitution provides that all individuals, including children, have a right to be free from unreasonable searches, and is applicable to the states through the Fourteenth Amendment.

145. Under this standard, state actors, including social workers, may not perform a search of a child unless the constitutional standard of reasonableness is met.

146. It is clearly established law in the Tenth Circuit that there is no "social worker" exception to the Fourth Amendment, and the Fourth Amendment applies to social workers and their investigations.

147. A child has a right to be free from an unreasonable search, just like someone suspected of a crime.

148. Under the Fourth Amendment, there is a reasonable expectation of privacy in the clothed/private areas of a child's person.

149. The search of private areas of a child's person is a severe violation of subjective expectations of privacy.

150. Unless there is an emergency, a child's clothed/private areas may not be searched without parental consent or a court order.

151. Fourth Amendment rights are violated when a government official views, photographs, or otherwise records another's unclothed or partially clothed body without meeting the constitutional standard.

152. Around November or December 2014, Defendant Woodard searched I.B.'s person by viewing I.B.'s unclothed or partially clothed body, and taking color photographs of what she observed.

153. Defendant Newbill directed Defendant Woodard to perform that search.

154. The search of I.B. was unreasonable in that Jane Doe did not consent to the search of I.B.'s body, or to having areas of I.B.'s body covered by clothing photographed, nor was there a court order, and no emergency or other exigent circumstances existed to make obtaining consent or a court order impractical.

155. Despite the fact that Jane Doe was not accused of abusing I.B., Woodard never even notified Jane Doe afterwards. Indeed, when confronted, she lied to Jane Doe, stating that she had not performed such a search. It took Jane Doe weeks to track down the information after I.B. informed her mother that she had been searched.

156. Upon information and belief, color photographs of I.B. taken by Defendant Woodard documenting this strip search exist and are insufficiently secured.

157.     Defendants' actions violated rights secured to I.B. by the Fourth Amendment of the United States Constitution.

158.     In conducting the search, Defendants acted intentionally, willfully, and wantonly, and in heedless and reckless disregard of I.B.'s right to be free from an unreasonable search.

159.     I.B. suffered injuries and damages from violation of her rights.


**Second Claim for Relief**

**Violation of I.B's rights under the Fourth Amendment of the U.S. Constitution to be free from unreasonable searches and to personal privacy by Defendants Rhodus and Bengtsson, in their individual capacities, and by Defendants Bengtsson and Bicha in their official capacities for prospective relief.**

160.     Plaintiffs incorporate here by reference the allegations set forth above.

161.     Defendants Rhodus and Bengtsson are personally liable for the damages stemming from the unconstitutional search of I.B. by way of "supervisory liability" because they both possessed personal responsibility for the local policy and custom of El Paso County DHS, and for the failure to train and supervise Defendants Woodard and Newbill, by virtue of their job descriptions and the personal responsibility thereof as stated in the preceding paragraphs.

162.     As stated above, statewide policy, and local policy and custom encourages strip searching children whenever injuries are alleged. DHS workers view and photograph areas of children's bodies normally covered by clothing, without consent by parents or a court order, and often even without notification.

163.	These policies and custom also permit the photographs to be later stored in an unlocked file room at El Paso County DHS, with access to the photographs available to anyone who works for DHS.

164.	The continued application of the policies and customs over which Defendants Rhodus and Bengtsson possessed personal responsibility caused the search of I.B. to take place in the unreasonable manner described in the preceding paragraphs, and caused the photographs of I.B. which were taken to be insufficiently secured to protect her privacy. Accordingly, the local policy and custom of El Paso County DHS, as directed by Rhodus and Bengtsson, was a direct cause of the deprivation of I.B.'s constitutional rights.

165.	Defendants Rhodus and Bengtsson reasonably knew or should have known that the current inadequate policies and customs would cause their subordinates to inflict constitutional and related injuries. Defendants knew or should have known that this custom and policy was both unconstitutional and endangered children, because of clearly established law, and because of allegations in *Doe v. McAfee*.

166.	Based on this information of which, upon information and belief, Defendants Rhodus and Bengtsson had actual knowledge, Defendants Rhodus and Bengtsson have been on notice for at least two years that a custom and policy had developed where caseworkers were strip searching and photographing children without proper safeguards, and that there were both constitutional and safety problems with this custom and policy.

167.	Despite the unconstitutionality of their policies, and the risks to children inherent in such policies, Defendants Rhodus and Bengtsson remained deliberately indifferent to the

rights of I.B. by not only personally acquiescing in, being responsible for, and promulgating the local policy and custom permitting and encouraging such strip searches, but providing no reasonable limitations and safeguards to such strip searches.

168.     Defendants Rhodus and Bengtsson also had personal responsibility either to train and supervise caseworkers directly or to oversee and provide training and supervision for El Paso County DHS and the Children, Youth and Family Services Division.

169.     The training program for protection of children from unconstitutional Fourth Amendment searches and from related trauma and possible sexual abuse was inadequate to train Defendants Woodard and Newbill to carry out their duties.

170.     Defendants Rhodus and Bengtsson did not train caseworkers on when and how to conduct an examination that does not have abusive overtones, and that would not provide opportunities or temptations for caseworkers who are, or could become, sexual offenders.

171.     Defendants Rhodus and Bengtsson did not train and supervise with a view to protecting the medical privacy of children, or require sufficient safeguards for the color photographs obtained from strip searches.

172.     Given the high probability of constitutional violations, the fact that constitutional violations in fact occurred, the shockingly high rate of child sexual abuse by public employees in public institutions, and the known and present danger of permitting public officials to examine children's private areas, the need for more training and supervision, or different training and supervision, was obvious.

173.    Moreover, Defendants Rhodus and Bengtsson reasonably knew or should have known that the current lack of training and supervision would cause their subordinates to inflict constitutional and related injuries, because of allegations in *Doe v. McAfee*, but chose to remain deliberately indifferent to the rights of I.B.

174.    Defendants Rhodus and Bengtsson were on notice that their inadequate training and supervision might lead to child abuse or otherwise endanger children, because of allegations in *Doe v. McAfee*, yet they continued to act knowingly and with deliberate indifference.

175.    Given that constitutional law, standard public policy, and a reasonable standard of care all hold that government workers and those who work with children should not do informal examinations of children's private areas, this failure to train exposed I.B. to severe danger.

176.    Defendants Rhodus and Bengtsson violated clearly-established rights secured to I.B. by the Fourth Amendment of the United States Constitution. Defendants Rhodus and Bengtsson personally failed to train and supervise Defendants Woodard and Newbill adequately, or possessed personal responsibility for an overall agency failure to inadequately train or supervise.

177.    The statewide policy, local policy and custom of El Paso County DHS, and the failure to train and supervise Defendants Woodard and Newbill, were direct causes of the deprivation of I.B.'s constitutional rights.

178.    The statewide policy, and local policy and custom of El Paso County DHS, are causing a continuing violation of I.B.'s constitutional rights in that she may again be subjected

to an unreasonable search, and that photographs of I.B. are insufficiently stored to protect her privacy.

179.     Because the continued implementation of the aforementioned policy and custom violate federal law under 42 U.S.C. § 1983 and the United States Constitution, Reggie Bicha on behalf of the state DHS, and to the extent his agents are not otherwise enjoined, Richard Bengtsson on behalf of El Paso County DHS, is liable in his official capacity for prospective relief to enforce federal law.

**Third Claim for Relief**
**Violation of Jane Doe's and I.B.'s Fourteenth Amendment constitutional liberty interests and constitutional rights to familial privacy by Defendants Woodard and Newbill.**

180.     Plaintiffs incorporate here by reference the allegations set forth above.

181.     Defendants acted at all times under color of state law.

182.     Jane Doe and I.B. both had clearly-established constitutional liberty interests in Jane Doe's care, custody, and control of I.B., and in familial association and privacy.

183.     Jane Doe and I.B. both had a reasonable expectation of privacy that their familial relationships would not be subject to unwarranted state intrusion.

184.     A parent's fundamental liberty interests include the care and management of her child. The child in turn has fundamental liberty interests and a right to have her care directed by her mother.

185.     The right to family association includes the right to have medical decisions such as physical examination made by the parent, not the state. The parent has the right to

make those decisions, and the child has a right to have these decisions made by her parent, not the state.

186.     Around November or December 2014, Woodard searched I.B. without prior notice to Jane Doe, and without consent from her. Woodard never even notified Jane Doe afterwards. It took Jane Doe weeks to track down the information, after I.B. informed her mother she had been searched.

187.     Defendant Newbill directed Defendant Woodard to perform the search.

188.     Defendants had no compelling interest in failing to request consent from Jane Doe prior to searching I.B., as Jane Doe was not alleged to have been responsible for any alleged abuse of I.B.

189.     Defendant Woodward's actions after the search also demonstrate that Defendants' interests in interfering with Plaintiffs' familial rights did not outweigh Jane Doe's right to make decisions for her child, and I.B.'s right to have those decisions made by her mother.

190.     When asked, Defendant Woodard initially lied to Jane Doe about the search, further violating her rights. She said that Jane Doe did not have a right even to know about the search, and that her rights as a parent had been voided by the (false) allegation of abuse. When Jane Doe found out the truth and said she was talking to an attorney, Defendant Woodard retaliated by initiating a search of Jane Doe's son, I.B.'s little brother, the very next day.

191.     Defendants' conduct was willful and wanton, and done heedlessly and recklessly, without any regard for I.B.'s and Jane Doe's constitutional rights, their privacy, or their safety.

**Fourth Claim for Relief**

**Violation of Jane Doe's and I.B.'s Fourteenth Amendment constitutional liberty interests and constitutional rights to familial privacy by Defendants Rhodus and Bengtsson in their individual capacities, and by Defendants Bengtsson and Bicha in their official capacities for prospective relief.**

192. Plaintiffs incorporate here by reference the allegations set forth above.

193. Defendants Rhodus and Bengtsson are personally liable for the damages stemming from the unconstitutional search of I.B. by way of "supervisory liability" because they both possessed responsibility for the local policy and custom of El Paso County DHS, and for the failure to train and supervise Defendants Woodard and Newbill, by virtue of their job descriptions and the personal responsibility thereof as stated in the preceding paragraphs.

194. As stated above, statewide policy, and local policy and custom encourages strip searching children whenever injuries are alleged, viewing and photographing areas of their bodies normally covered by clothing, without consent by parents or a court order, and often even without notification.

195. These policies and custom also permit the photographs to be later stored in an unlocked file room at the El Paso County Department of Human Services, with access to the photographs available to anyone who works for the Department.

196. The continued application of the policies and customs over which Defendants Rhodus and Bengtsson possessed responsibility caused the search of I.B. to take place in November or December 2014 without the consent or knowledge of her mother, Jane Doe. Accordingly, the statewide, and local policy and custom of El Paso County DHS was a direct cause of the deprivation of Plaintiffs' constitutional rights.

197.     Defendants Rhodus and Bengtsson reasonably knew or should have known that the current inadequate policies and customs would cause their subordinates to inflict constitutional and related injuries. Defendants knew or should have known that this custom and policy was both unconstitutional and endangered children, because of clearly established law, and because of allegations in *Doe v. McAfee*.

198.     Based on this information of which, upon information and belief, Defendants Rhodus and Bengtsson had actual knowledge, Defendants Rhodus and Bengtsson have been on notice for at least two years that a custom and policy had developed where caseworkers were strip searching and photographing children without proper safeguards, and that there were both constitutional and safety problems with this custom and policy.

199.     Despite the unconstitutionality of their policies, and the risks to children inherent in such policies, Defendants Rhodus and Bengtsson remained deliberately indifferent to the rights of I.B. by not only personally acquiescing in, being responsible for, and promulgating the local policy and custom permitting and encouraging such strip searches, but providing no reasonable limitations and safeguards to such strip searches.

200.     Defendants Rhodus and Bengtsson also had personal responsibility either to train and supervise caseworkers directly or to oversee and provide training and supervision for El Paso County DHS and the Children, Youth and Family Services Division.

201.     The training program to protect families' liberty interests in the care, custody, and control of their children, and to give families adequate and complete information about DHS activity with respect to their children, was also inadequate.

202.    Defendants Rhodus and Bengtsson did not train caseworkers on the rights of parents to the care, custody, and control of their children, and children's reciprocal rights, during the strip searching and photographing process.

203.    Defendants Rhodus and Bengtsson reasonably knew or should have known that the current lack of training and supervision would cause their subordinates to inflict constitutional and related injuries, because of clearly-established law and allegations in *Doe v. McAfee*, but chose to remain deliberately indifferent to the rights of I.B.

204.    Defendants Rhodus and Bengtsson were on notice that their inadequate training and supervision might lead to violation of Plaintiffs' Fourteenth Amendment rights, because of allegations in *Doe v. McAfee*, yet they continued to act knowingly and with deliberate indifference.

205.    Given that constitutional law, standard public policy, and a reasonable standard of care all hold that government workers and those who work with children should not do informal examinations of children's private areas, this failure to train exposed I.B. to severe danger.

206.    Defendants Rhodus and Bengtsson violated clearly-established liberty interests and familial privacy rights secured to Plaintiffs by the Fourteenth Amendment of the United States Constitution. Defendants Rhodus and Bengtsson personally failed to train and supervise Defendants Woodard and Newbill adequately, or possessed personal responsibility for an overall agency failure to inadequately train or supervise.

207.    The statewide policy, local policy and custom of El Paso County DHS, and the failure to train and supervise Defendants Woodard and Newbill, were direct causes of the deprivation of Plaintiffs' constitutional rights.

208.     The statewide policy, and local policy and custom of El Paso County DHS, are causing a continuing violation of Plaintiffs' constitutional rights in that I.B. may again be searched without Jane Doe's consent, and that photographs from I.B.'s search continue to be stored without regard to Plaintiffs' Fourteenth Amendment rights.

209.     Because the continued implementation of the aforementioned statewide and local policy and custom violate federal law under 42 U.S.C. § 1983 and the United States Constitution, Reggie Bicha on behalf of the state DHS, and to the extent his agents are not otherwise enjoined, Richard Bengtsson on behalf of El Paso County DHS, is liable in his official capacity for prospective relief to enforce federal law.

### Fifth Claim for Relief
### *Monell* Claim against Defendant El Paso County Board of County Commissioners for violation of I.B.'s Fourth and Fourteenth Amendment rights and Jane Doe's Fourteenth Amendment rights

210.     Plaintiffs incorporate here by reference the allegations set forth above.

211.     Defendant acted at all times under color of state law.

212.     BOCC is the policymaking body of El Paso County, and as such, is responsible for the custom and unwritten policies that developed at El Paso County DHS as municipal policy, and is the appropriate entity to be named for suit when municipal liability is alleged.

213.     Though El Paso County DHS is an agency and arm of the state, it is both funded in part and receives oversight provided by the DHS Advisory Commission, appointed by BOCC. Thus, BOCC has the power to approve or condemn El Paso County DHS local policies and custom.

214. As stated above, local policy and custom encourages strip searching children whenever injuries are alleged, viewing and photographing areas of their bodies normally covered by clothing, without consent by parents or a court order, and often even without notification.

215. These policies also permit the photographs to be later stored in an unlocked file room at the El Paso County DHS, with access to the photographs available to anyone who works for DHS.

216. Based on the allegations in another lawsuit against Defendant, *Doe v. McAfee*, Defendants either knew or should have known of a clear and persistent pattern of illegal strip searches of children being performed in accordance with local unwritten policy and custom in El Paso County by El Paso County DHS agents each year.

217. Despite having either actual or constructive notice of the widespread practice of strip searching and photographing children without parental consent or a court order, and that such policy and custom was violating constitutional rights, Defendants remained deliberately indifferent, continuing to fund El Paso County DHS, making no rules, and holding no discussion to change the local policy and custom. The Advisory Commission did not even discuss the issue.

218. The El Paso BOCC has failed in its responsibilities to the children of El Paso County, not only approving and encouraging the violation of their constitutional rights but exposing them to trauma and the risk of sexual abuse.

219. Among other things, this approval by the BOCC of the unconstitutional and dangerous local policy and custom of El Paso County DHS was a direct cause of the deprivation of I.B.'s Fourth and Fourteenth Amendment rights, and Jane Doe's Fourteenth Amendment rights.

220. I.B. and Jane Doe suffered injuries and damages from violation of their rights.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that this Court award them relief as follows:

Declare that the statewide policy and El Paso County DHS local policy and customs are unconstitutional in violation of the Fourth and Fourteenth Amendments;

Enter judgment on behalf of Plaintiffs and against all Defendants but Richard Bengtsson and Reggie Bicha in their official capacities, for special and general damages on their claims, to be determined at trial by a jury, including but not limited to expenses incurred, psychological damages and treatment, and pain and suffering;

Enter judgment for injunctive relief against Richard Bengtsson and Reggie Bicha in their official capacities that: (1) DHS may not apply its unconstitutional policies to I.B., and any searches or seizures of I.B. must be performed in compliance with the Fourth Amendment; (2) all photographs of I.B. in the possession of DHS must be destroyed or securely stored with limited access; and (3) El Paso County DHS must institute policies and training that will protect I.B.'s constitutional rights and her safety.

Enter judgment on behalf of Plaintiffs and against all individual Defendants acting in their individual capacities for exemplary, punitive and/or treble damages in an amount sufficient to deter similar misconduct, jointly and severally, to be determined at trial by a jury;

Enter judgment for reasonable attorneys' fees and costs incurred in bringing this action in accordance with 42 U.S.C. § 1988, including expert witness fees;

Enter judgment for pre- and post-judgment interest to the extent allowed by law; and

Grant such other and further relief as it deems equitable and just.

## JURY DEMAND

Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted this 20th day of August, 2015.

s/ Theresa Lynn Sidebotham
**_Theresa Lynn Sidebotham_**
Telios Law PLLC
1840 Deer Creek Rd., Suite 101
P.O. Box 3488
Monument, CO  80132
Telephone:  (855) 748-4201
FAX:  (775) 248-8147
E-mail:  tls@telioslaw.com

**_Jessica Ross_**
Telios Law PLLC
1840 Deer Creek Rd., Suite 101
P.O. Box 3488
Monument, CO  80132
Telephone:  (855) 748-4201
FAX:  (775) 248-8147
E-mail:  jer@telioslaw.com

**_Autumn Ascano_**
Telios Law PLLC
1840 Deer Creek Rd., Suite 101
P.O. Box 3488
Monument, CO  80132
Telephone:  (855) 748-4201
FAX:  (775) 248-8147
E-mail: ara@telioslaw.com

## CERTIFICATE OF SERVICE

I hereby certify that on the 20th day of August, 2015, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system that automatically sends notification of such filing to the following email addresses:

| | |
|---|---|
| Diana May: | dianamay@elpasoco.com, caseycampbell@elpasoco.com |
| Kenneth Hodges: | kennethhodges@elpasoco.com, caseycampbell@elpasoco.com |
| Elizabeth J. McCarthy: | elizabeth.mccarthy@state.co.us |
| Tanya Wheeler: | tanya.wheeler@state.co.us |

*s/ Mary E. Craig*
Mary E. Craig

4837-8739-3318, v. 5